NEGRO STEPHEN CORNISH *vs.* JACOB WILLSON.—E. S., *June Term*, 1848.

Upon the trial of a petition for freedom, the petitioner offered in evidence the will of his master—proof of his identity, and his right to freedom, according to the terms of the will. The defendant then proved, that the executors took upon themselves the duty of administration; copies of their letters and bond; inventory of the personal estate, including the slaves; debts due the deceased; several administration accounts showing ultimately an over-payment by the executors, the negroes being still undisposed of, and charged to them at the appraisement. The defendant further proved an order of the *Orphans Court* directing a sale of the balance of the testator's personal estate, and an account of sales of negroes returned, including the petitioner, who objected to the admissibility in evidence, of the accounts of the executor, the order of sale of the *Orphans Court*, and return of sales by the executors, which objection was overruled. This was affirmed upon appeal.

That a petitioner for freedom is the same person mentioned in the will of a testator, declaring him free at a certain period, that he was the property of the testator at the time of his death, under the age of forty-five at the period specified for his manumission, able to gain a sufficient maintenance, will not authorize the court to instruct the jury that he is entitled to freedom where an insufficiency of personal assets to pay creditors appears, there being no evidence of the value of the testator's real estate—no means by which the jury could find its value—nor any charge upon the real estate of the testator to pay debts, either upon the true construction of the act of 1796, ch. 67, or

the will of the testator—nor jurisdiction to enforce a charge upon the realty for the payment of debts.

Upon a petition for freedom in a court of law, no evidence of the value of real estate can legally be submitted to the jury, or form a subject for its determination.

A devise of land to be sold by one's executors at a specified sum, and if it will not sell for that, not to be sold, does not constitute a charge on it, or its proceeds, for the payment of debts.

An order of the *Orphans Court* to sell the balance of a testator's personal estate, which included negroes, it being necessary for the payment of debts, does not restrict the sale of manumitted slaves to terms for years.

The terms in a will, " and after my debts and funeral charges are paid, I devise and bequeath," in legal effect at common law, charge the real estate of a testator with the payment of debts, in the event of there *not* being a sufficiency of personal estate to pay them, without a resort to slaves manumitted by the will.

But in Maryland, since the act of 1785, ch. 72, the insertion of those words in a will are immaterial and inoperative; that act renders the real estate in aid of the insufficient personalty, equally liable for the payment of debts, whether those words be contained in the will or not, or whether the deceased died testate or intestate. They are now of almost unmeaning form, and *rarely* of any import.

In the case of *Fenwick vs. Chapman,* 9 *Peters,* 461, if those words do make the debts of the testator *a charge* upon the realty, still it does not follow that it is primarily applicable to their payment.

The personal estate is the natural and primary fund for the payment of debts and legacies; and even where they are expressly charged upon the real estate descending or devised, the real estate is only to be resorted to as an auxiliary fund, after the personalty has been exhausted.

Upon a bill in equity to sell the real estate of a deceased debtor, on the ground that his personalty was insufficient, Chancery does not take testimony or receive admissions from the executor, that the real estate is sufficient for the payment of the debts of a testator, and, upon being satisfied thereof, ratify the exemption by the testator of his personal estate, adjudicate its disposition as directed by the will, there terminate its power, and leave the creditors to recover their debts as they may.

In case where slaves were manumitted by last will, and the personalty was not sufficient for the payment of debts, equity will suspend proceedings at law, which prevented the court of law from doing full justice to all parties; decree a sale of the real estate charged with the payment of debts, and apply the proceeds of sales to their satisfaction. Creditors being thus paid, the manumitted slaves could successfully prosecute their petition for freedom.

A testator, by exempting the whole, or any part of his personal estate from the payment of debts, cannot, at law, bar a creditor's suit against his executor. Such a bar can only be made available in equity when the intent of the testator may be carried out, and the interests of all concerned protected.

Cornish *vs.* Willson.—1848.

The case of *Fenwick vs. Chapman,* 9 *Peters,* 461, as decided by the *Circuit Court of the District of Columbia, and the Supreme Court of the United States,* objected to as not containing a correct exposition of the local law of *Maryland,* and not obligatory on this court.

The natural presumption, as to every testator, unless the contrary appears on the face of the will, is, that *all* his devises, bequests and directions, shall be gratified and conformed to. He assumes himself to be in a condition to make them; none have any preference, except by his intent. He is presumed to know the established principles of construction.

In a case of deficiency of assets, all specific have a priority in payment over general legacies. All specific legacies, in this respect, stand on the same footing, unless testator otherwise intended.

All debts and legacies are payable out of personal estate, and are only chargeable upon real estate by the will, either by its express terms, or necessary implication from its language.

The furnishing slaves manumitted, with a place of residence on the testator's property, and giving some of them annuities by the will, does not conclusively demonstrate the right to freedom in *Maryland.* Neither is the fact, that the manumitting terms are in strict conformity with our act, conclusive of the right to freedom.

By the act of 1752, ch. 1, the power of manumitting slaves by last will was taken away; the prohibition continued until a few years before the act of 1796, ch. 67, which latter act restored the right permanently.

A manumitting clause in a will must be construed in connection with the acts of Assembly.

Negroes, by will declared to be free from the death of the testator, or at any future time, are as regularly taken possession of, and held in bondage by the executor, and appraised at their full value, as slaves for life, and returned in the inventory as part of the property of the deceased, as they would be, if no clause of manumission had been inserted in the will.

If a petition for freedom were filed by such manumitted slaves, no court in *Maryland* would award their freedom—and thus release the executor—until the time had elapsed within which the creditors were warned to bring in their claims, and the executor was required to settle an account of his administration with the Orphans court; nor then, unless the court are not perfectly satisfied that the liberation of the manumitted slaves can work no prejudice to creditors.

The design of the legislature in declaring in the act of 1796, that manumission might be made to take effect at the death of a testator, or at any other period limited in his will, was not to indicate any priority in regard to such manumission, but to put an end to a doubt which then prevailed, whether a deed or will could give freedom to take effect in futuro.

If a testator by his will manumit his slaves, without naming any time at which they are to be free, they are entitled to freedom at the same time with those declared to be free at testator's death, and the same inferences and presumptions in their favor.

Unless there are words, not express, but tantamount to express, so as to afford demonstration plain, that the personal estate is intended to be given as a specific legacy, and exempt from the payment of debts, it shall be taken subject to them.

An intention on the part of a testator to charge his real estate with the payment of debts, and exonerate specific legacies from that liability, does not result from the nature of manumission granted by his will.

The act of 1796, ch. 67, was to restore a power taken away by the act of 1752, ch. 1, and confer on a testator the same power to give by last will and testament the slave or his services, to the slave himself, that he previously enjoyed of making such a bequest to any other person.

An insolvent is one who has not property enough to pay all his debts.

In the event of a deficiency of the testator's assets for the payment of his debts, the executor, *under the direction of the Orphans court,* may if the creditors are willing to delay the payment of their claims, *hire out* the manumitted slaves, until the *hire of each,* as a specific legatee, shall raise his proportionate contribution towards the payment of debts; or he may *sell* the manumitted slaves for such length of time as shall be necessary to raise the amount of their respective contributions; or in the event of its being necessary for that purpose, he may sell the manumitted slaves as slaves for life.

Such proceedings of the Orphans court being *ex parte,* may be afterwards reinvestigated, either at law, or in equity.

A charge on real estate for the payment of debts or legacies, is peculiarly the subject of equitable jurisdiction in *Maryland,* and of it a court of law can take no cognizance.

Manumitted slaves are the proper parties, complainants, to proceed in equity to enforce a charge on lands for the payment of creditors, and seek a sale of real estate—the proceeds of which should be applied to their exoneration. Equity, however, will not decree freedom.

The manumitted slave, then, by the executor's assent to the legacy of freedom, or by petition in a court of law, where the rights of creditor cannot interpose any barrier, may have his freedom secured by judgment.

The interpretation of the *S. C.* of *U. S.* to the case of negro *George et al. vs. Corse's Administrator,* 2 *H. & G.* 1, in 9 *Peters,* 476, not adopted by this court.

Appraisements of value of land are often uncertain and fallacious proof. An actual sale is higher proof.

An executor who, upon his own knowledge only, admits that lands charged with the payment of debts, are of sufficient value to satisfy the creditors— the personal estate being insufficient—permits the manumitted slaves of the testator to go free, and assents to their legacy of freedom, commits a *devastavit,* and is an incompetent witness to prove the facts necessary to justify his course.

Prior to the act of 1831, ch. 315, sec. 10, money coming into the hands of an executor or administrator from his sale of real estate for the payment of debts,

was not covered by the testamentary or administration bond. By that act, the law was changed.

In a court of law, equitable assets has no legal entity—are of no value—not recognized by it, and of them no cognizance can be taken.

Courts of equity only, prior to the act of 1831, could administer equitable assets.

If a creditor having two funds, to which he may resort for the payment of his debt, pursue in equity the fund to which only, another creditor has the right to resort; or if, under the like circumstances, he proceed to prove his debt under a commission of bankruptcy, equity will compel him to seek payment out of that fund, to which such other creditor had no right to resort.

But if one of the funds be *legal* assets, and the other equitable, and the creditor is pursuing the *legal* assets, equity will not strip him of his legal rights, marshal the assets, and oblige such creditor to seek payment out of the *equitable* assets.

On whom the burden of proof rests of proving the amount of debts—a sufficiency or insufficiency of assets, upon a petition for freedom.—*Qr.*

The case of *Allen vs. Sharp*, 7 *G. & J.* 96, explained.

The case of negro *George vs. Corse*, 2 *Harris & Gill*, 1, is fully entitled to the confidence of this court—was the unanimous decision of the judges who sat on that cause.

APPEAL from *Dorchester* County Court.

This was a petition for freedom, filed on the 22d October, 1846, by the appellant against the appellee.

The petition alleged that the petitioner is held in bondage by *Jacob Willson* of said county, and is claimed by him as his slave. The petitioner alleged himself to be free, and entitled to enjoy his liberty, and therefore prayed the court to grant him his freedom, &c.

The defendant pleaded that *Stephen Cornish* is not entitled to his freedom, &c.

1ST EXCEPTION.—At this trial of this cause, the plaintiff offered in evidence the last will of *Beachamp Harper*, late of *Dorchester* County, deceased, duly proved. This will contained, among others, the following devises:—

"Item. It is my will that all my just debts shall be truly paid by my executor.

"Item. I give and bequeath unto my wife, *Ann Harper*, &c. my bed and furniture, one grey mare, one cow and calf; her choice of all that I have.

"Item. I give to my daughters, *Mary, Betsey* and *Peggy*, one shilling each, in full of their part of my estate.

"Item. I bequeath unto my son, *William Smith Harper*, all my wearing apparel, excepting one fine hat.

"Item. I leave forty acres of land, joining *Daniel Layton*, to be sold, if it shall sell for forty-five shillings per acre—it being part of a tract of land called 'Leverton's Chance,'—by my executors; and if it will not sell for that, not to be sold.

"Item. I bequeath unto my daughter, *Milly Harper*, seventy-five pounds, *to be raised out of my estate*, as her full part of my estate.

"Item. I leave *all my personal estate to be sold, and after my just debts are paid, to help to raise the seventy-five pounds* I have left my daughter, *Milly Harper*, as her full part.

"Item. I leave all my lands not mentioned, *to be rented out by executors*, until my son, *Edward Harper*, shall arrive to the age of twenty-one years,—and the money, all but a sufficiency to support my three smallest children; that is to say, *Beachamp Harper*, *Sarah Harper* and *Milly Harper*, to be put on interest until my daughter, *Milly*, shall arrive to the age of sixteen years, and then my son, *William Smith Harper*, to have the residue of the money and interest, after the aforesaid support, in full of his part of my estate.

"Item. I give and bequeath unto my daughter, *Sarah Harper, one negro boy, called Jacob*, in full of her part of my estate; provided, the said negro boy shall live as long as she; but should the said negro boy die first, after his decease, for my son, *Edward Harper*, and my son, *Beachamp Harper*, to pay her ten pounds a year during her natural life, and *at her decease, for said negro boy to be free.*

"Item. I give and bequeath unto my two sons, *Beachamp Harper* and *Edward Harper, all my land* that I now hold or possess, to be divided between them in quantity and quality, when my son, *Edward Harper*, shall arrive at the age of twenty-one years, to them and their heirs forever: and I do hereby constitute and appoint my son-in-law, *William Wheatly*, and my son, *William Smith Harper*, executors of this my last will, given, &c. 11th September, 1795."

N. B.—Before the signing, sealing, and delivery of these presents, the said *Beachamp Harper* doth set free, and to be at their liberty as followeth: one negro woman called *Leddy*, and one negro man called *David*, and one negro woman called *Taymer*, to be free 1st January, 1799, and one negro boy called *Thomas*, to be free 1st January, 1815, and one negro boy called *Stephen*, to be free 1st January, 1817, and one negro boy called *Jonathan*, to be free 1st January, 1820, &c.

Attested by three witnesses. Signed, B. H.

The will was admitted to probat on the 21st September, 1795. The will and annexed manumission being both proven by the subscribing witnesses.

The following affidavit, certified from the record of the Orphans court aforesaid, was also given in evidence :—

"DORCHESTER COUNTY, *Sct.*—On the 21*st September*, 1795, *Solomon Twyford*, being a new Quaker, did solemnly declare and affirm, that he was present at the late mansion house of *Beachamp Harper*, deceased, and at the time when the aforegoing instrument of writing was executed; and that he heard the testator, *Beachamp*, say, that negro *Leddy* and negro *David* were to be free at his death; and that he desired *Matthew Smith* to write his will in such words that they might be free immediately after his death,—and the rest of the negroes mentioned in the subsequent writing, to be free at the particular periods or times mentioned in said writing, immediately after their names respectively.

"Certified by JOHN GOLDSBOROUGH,
"*Register of Wills, Dor. County.*"

The petitioner further offered in evidence by *Wheyland Millican*, that the said petitioner was the property of the said *Beachamp Harper* at the time of making his said will, and at the time of his death—and that he is the same person mentioned therein: and also proved by *Solomon Robinson* and *Luke Messick*, that on the first day of January, 1817, the term at which the said freedom of the said negro was to commence, he was able to work and gain a sufficient livelihood and main-

39      v.6

tenance, and that he was under the age of fifty years; and also offered in evidence by *William S. Harper*, an admission of the said respondent, that the said petitioner came out of the estate of the said *Beachamp Harper*, and that he was willed free by the will of said *Harper;* but the law of 1796 would not let him take his freedom: and by *Luke Messick*, a further admission by the said respondent, that the said petitioner came out of the estate of the said *Beachamp Harper*, but was sold for the payment of debts; and on some other occasion, on account of the insufficiency of assets; and on one occasion, in passing, the respondent in conversation with others, heard him say simply, that he came out of said estate.

*The defendant* then offered in evidence, that the executors in said will took upon themselves, in due form of law, the administration thereof; and also offered in evidence an office copy of the letters of administration, of the administration bond of the said executors, to wit :—

The letters testamentary were granted on the 21st September, 1795 ; the administrator's bond dated the same day.

The defendant also offered in evidence the inventory of the personal estate, returned by the said executors to the Orphans court of *Dorchester* County, dated 11th April, 1796.

The amount of personal estate and debts due the estate, exclusive of negroes, amounted to . . . £478 4 2

The negro *David's* age, thirty-nine. *Taymer's* age, thirty-seven. Boy *Jacob*, nine years; one boy, five years; one boy, three years, and one boy, five months. Negro woman, *Leddy*, fifty-seven, . . . . . . . 211 5 0

£689 9 2

To which evidence of the respondent, the petitioner made no objection.

The defendant further offered in evidence the administration accounts of the executors mentioned—1, 2, 3 and 4, as follows, to wit :—

The *first* testamentary account, proved on the 1st May, 1797, included the negroes, £211 5 0—charged the executors with debts collected—showed disbursements allowed, £291 18 0, and a balance not accounted for of £464 7 10½.

The *second* account, dated 29th May, 1797, showed a balance, including the negroes, of £391 19 6.

The *third* account, dated 6th March, 1800, showed a balance of £287 4 8½.

The *fourth* account, dated 9th August, 1800, after charging the executors with the last balances, allowed them disbursements to amount of £326 18 11, showing an over-payment of £39 14 2;—the estate accounted for being £287 4 8½. The negroes being still undisposed of; their appraisement being charged to the executors.

The defendant also filed an order of the *Orphans court*, directing the sale of the balance of property of said *Beachamp Harper*, viz :—

"On application of *William Wheatly* and *William Smith Harper*, executors of *Beachamp Harper*, deceased, for a further order to sell all and singular the residue of the deceased's effects, to pay the creditors of the deceased, the court order that the said executors, without delay, proceed to sell at public sale, all and singular the residue of the goods and chattels of the deceased, to the highest bidder on the following terms:—

"Notice of such sale shall be advertised in writing, at the several places of worship, ordinaries, and other public places in the hundred, where the said goods and chattels shall be, and likewise in the two next adjoining hundreds, for the space of twenty days at the least before the sale, and the time and place of sale shall be mentioned in every such advertisement. Every purchaser shall be entitled to a credit of six months; but before a removal of the property, the purchaser shall give a bond, bill, or note, with security, if required, for insuring a punctual payment of the money, and a fair account of said sale, made out with two columns; one for the appraisement, and the other for the sale of each article, dated and subscribed by the clerk who vendued said effects, agreeable to the rules

of this court, and returned by the said executors to the next court succeeding the sale."

Also, a return of sales of certain negroes, the property of the said *Beachamp Harper*.

The defendant also offered in evidence the additional sales of part of the property of *Beachamp Harper*, late of *Dorchester* County, deceased.

|  |  | Appraisement. |  | Sale. |  |
|---|---|---|---|---|---|
| One negro man, *David*, | . | £60 | 0s. | £58 | 0s. |
| " negro woman, *Taymer*, | | 50 | 0 | 45 | 0 |
| " child, *Thomas*, | . . | 22 | 10 | 25 | 15 |
| " " *Stephen*, | . . | 18 | 15 | 22 | 10 |
| " " *John*, | . . | 10 | 0 | 10 | 0 |
| " negro woman, *Lid*, | . | 25 | 0 | 7 | 10 |
| | | £186 | 5s. | £168 | 15s. |

This report was dated 6th October, 1797, verified by affi-davit, and certified as a true copy by the register of wills.

To the admissibility of all of which last mentioned papers, to wit: the accounts of the said executor, the order of sale by the said Orphans court, and the return of sales by the said executors,—the petitioners objected, and prayed that the same might be rejected: which said objection and prayer, the court (SPENCE, C. J. and GOLDSBOROUGH, A. J.) overruled and ad-mitted the same to be offered in evidence to the jury. The petitioner excepted.

2D EXCEPTION.—Upon the evidence in this cause, before the evidence excepted to in the first bill of exception was pro-duced, the petitioner prayed the court to instruct the jury, that if they shall believe from the evidence in this cause, that the petitioner is the same negro *Stephen*, mentioned in the will of *Beachamp Harper*, and that he was the property of the said *Harper* at the time of his death, and that he was under the age of forty-five years on the 1st January, 1817, when his freedom was to commence, and that he was able to work and gain a sufficient maintenance and livelihood at that time, that he is entitled to his freedom: which prayer the said court,

(Spence, C. J. and Goldsborough, A. J.) granted and instructed the jury accordingly.

Whereupon, after the said evidence excepted to in the first bill of exception was offered, and which is prayed to be made a part of this exception, the said petitioner further prayed the court to instruct the jury, that unless they shall believe from the evidence in this cause, that there was a deficiency of *personal and real estate,* to pay the debts of the deceased testator, that then the freedom given to the said petitioner by the last will and testament of the said *Beachamp Harper* was not in prejudice of creditors, and that they must find for the petitioner; if they shall also find the facts mentioned in the preceding instruction: *which last instruction* the court refused to give. The petitioner excepted.

3d Exception.—The petitioner prayed the court to instruct the jury, that unless they shall believe from the evidence in this cause, that the testator, *B. H.* did not leave estate, real and personal, sufficient to pay his debts, and that the manumission of the petitioner was in prejudice of creditors,—and if they shall further believe from the evidence, that the petitioner is the same negro, *Stephen,* mentioned in his said will, and was the property of the said *Harper;* that he was under forty-five years of age, and able to gain a maintenance and support by his labor on the 1st January, 1817, when his freedom was to commence—they are bound to find a verdict for him: which said prayer was refused by the court, (Spence, C. J. and Goldsborough, A. J.) to which refusal the petitioner excepted.

4th Exception.—The petitioner prayed the court to instruct the jury, that unless they shall believe from the evidence in this cause that there was a deficiency of personal estate, including legacies, and also a deficiency of so much of the real estate as was devised to be sold by the executors of the said testator, in the following clause of his will:—

" Item. I leave forty acres of land, joining *Daniel Layton,* to be sold, if it shall sell for forty-five shillings per acre—it being part of a tract of land called ' *Leverton's Chance*'—by

my executors; and if it will not sell for that, not to be sold. That the manumission of said petitioner was not in prejudice of creditors,—and the said petitioner is entitled to his freedom, if they shall believe the facts stated in the first prayer of the petitioner, which is made a part of this: which said instruction the court, (SPENCE, C. J. and GOLDSBOROUGH, A. J.) refused to give. The petitioner excepted.

5TH EXCEPTION.—The petitioner prayed the court to instruct the jury, that if they shall believe from the evidence in this cause, that the said petitioner was willed to serve a term of years, to wit—till 1st January, 1817. Unless they shall further believe that he was expressly ordered to be sold as a slave for life, because of a deficiency of assets, they are bound to presume that he was sold only for the time which he had to serve; and if they shall further believe the facts mentioned in the first prayer, made a part of this, then they are bound to find for the petitioner: which instruction the court refused. Whereupon, the petitioner excepted.

6TH EXCEPTION.—The petitioner prayed the court to instruct the jury, that the clause in the will, in the words following, to wit :—

"Item. I leave forty acres of land, joining *Daniel Layton*, to be sold, if it sell for forty-five shillings per acre—it being part of a tract of land called '*Leverton's Chance*'—by my executors; and if it will not sell for that, not to be sold," was a charge upon the real estate to that extent; and that before the petitioner in this cause, could be barred of his right to freedom, the defendant must show that the said land was offered for sale, and would not bring the sum specified therein; and unless they shall believe from the evidence in this cause, that the said land would not sell for that sum, that then the said order of the Orphans court was contrary to law, and is no evidence in this cause of the insufficiency of assets. This instruction the court refused, and the petitioner excepted.

7TH EXCEPTION.—The petitioner prayed the court to instruct the jury, that the order of the *Orphans court* offered in evidence in this cause, and the return of sale thereon not

specifying that the petitioner therein mentioned, was sold as a slave for life, or otherwise than for the term of years mentioned in the said will, is no evidence to rebut the claim of the petitioner to his freedom: which instruction the court, (SPENCE, C. J. and GOLDSBOROUGH, A. J.) refused to give. The petitioner excepted.

8TH EXCEPTION.—The petitioner prayed the court to instruct the jury, that unless they shall believe from the evidence in this cause, that there was a deficiency of personal and real estate, to pay the debts of the deceased, that then the freedom given to the said petitioner by the last will and testament of the said *Beachamp Harper*, was not in prejudice of creditors; and that they must find for the petitioner, if they shall believe the facts stated in the instruction heretofore given to them at the prayer of said petitioner, which is made a part of this: which instruction the court, (SPENCE, C. J. and GOLDSBOROUGH, A. J.) refused to give. The petitioner excepted.

The verdict being against the petitioner for freedom, he appealed to this court.

The cause was argued before ARCHER, C. J., DORSEY and MARTIN, J.

By S. D. LECOMPTE, for the appellant, and

By JAS. A. STEWART for the appellee.

DORSEY, J., delivered the opinion of this court.

It being insisted that the reversal of the judgment before us is the inevitable result of the decision of the Supreme Court of the *United States*, in the case of *Fenwick vs. Chapman*, reported in 9 *Peters*, 461, it becomes our duty carefully to examine it in all its bearings, and to give to it that influence on the case before us, which the decisions of that elevated and learned tribunal ought always to exert over the judicial tribunals of the several States of our Union. From the nature of the matters in controversy, it is not, however, a case in which the Supreme Court have exercised its paramount judicial

authority, to which we are bound to submit and conform; but one which we may respectfully weigh and consider, and follow, or depart from, as our judgments may dictate.   It was brought to the Supreme Court by a writ of error to the Circuit Court of the *United States*, for the County of *Washington*, in the *District of Columbia*, in which latter court, the defendants in error had filed a petition for freedom, (which they claimed under the will of *Frances Edelin*, of *Maryland*,) and obtained a judgment in their favor against the plaintiff in error, who claimed them as his slaves, having purchased them of the executor of the deceased, at a sale made by the order of the Orphans court of *Prince George's* County, in *Maryland*.   It was in proof in the Circuit Court, that the slaves were sold by the executor, with all the other personal estate of the deceased, by the authority of the Orphans Court, as assets in the hands of the executor for the payment of debts—there not being enough to pay the same without the sale of the slaves, and without recourse to the real estate; *Edelin*, the executor, having purchased the slaves of *Fenwick*, by consent became defendant.   The following facts were agreed to, and with the evidence in the cause submitted to the Circuit Court:—

"It is agreed in this case—1st. That the petitioners are the same named in the will of *Frances Edelin*, deceased, to whom she gave their freedom after her death, as appears by the said will, a copy whereof is hereto annexed.

"2d. That *Edelin*, the defendant, was the executor of the last will and testament of said deceased; as such, sold in the year 1833, the petitioners to the other defendant, *Fenwick*.

"3d. That the sale of the petitioners was made in *Prince George's* County aforesaid, where the deceased lived at the time of her death, and where the petitioners were; and that from the time of the deceased's death to the time of their sale, they were permitted by the executor to go at large as free; and that after the purchase made by *Fenwick*, he brought them to the *District of Columbia*, where the present suit was instituted; and that after the institution of the said suit, *Fenwick* transferred his claim to the petitioners to the defendant,

*Edelin,* who repaid him his money, and appears to defend the suit.

"4th. That the deceased left real estate to an amount in value more than sufficient to pay her debts, without the sale of the negroes emancipated by the will, as will appear by her will, referred to and made a part of this agreement, but not personal estate sufficient.

" 5th. That the original copy of all the proceedings had in the Orphans Court of *Prince George's* County, relative to the settlement of the deceased's estate by her executors or administrators, may be filed as part of this case."

The Supreme Court, in its opinion affirming the judgment of the Circuit Court say, that *Frances Edelin's* will was dated in November, 1825, and that she died in the succeeding December: and immediately thereafter, the defendant, *Richard J. Edelin,* assumed the burthen and execution of the will; and that in virtue of an order of the said Orphans court, bearing date July 16th, 1833, to sell all the personal estate of *Frances Edelin,* passed on the petition of the executor, setting forth that *Frances Edelin,* by her will, had directed that certain negroes should be free at her death; and that he had discovered there were not assets enough, independent of those negroes, to discharge the debts of the testatrix. The petitioners were sold to the defendant, *Fenwick.* That the testatrix begins her will in the following words :—

" In the name of God, amen—I, *Frances Edelin,* of *Prince George's* County, in the State of *Maryland,* being of sound and disposing mind, memory and understanding, do make and publish this my last will and testament, in manner and form following :—

"First and principally. I commit my soul to the mercies of my dear Redeemer and Lord Jesus Christ, and my body to the earth, to be decently buried; and after my debts and funeral charges are paid, I devise and bequeath as follows :—"

Then follow sundry devises and specific legacies, and so much of the will relating to the freedom of the defendants in

error, and to the other persons manumitted by the will, is in these words:—

· ·"Item. I give and bequeath to my nephew, *Richard James Edelin*, the small house and lot now occupied by *Robert Frazier*, which I give to him, his heirs and assigns forever, with this proviso, that the negroes which are hereinafter mentioned, to be free—to live in the back room of said house.

·"Item. Negro woman, *Letty*, her daughter, *Kitty*—a mulatto, with her three children, to wit—*Eliza*, *Robert*, and *Kitty Jane*, with their future increase, and an old woman, named *Lucy;*—I do hereby declare them free at and after my death, and they shall have the right to live in and occupy the back room in the house and lot I give and bequeath to my nephew, *Richard James Edelin*. To the two old women, I give and bequeath $10 a year to each of them as long as they live; and $10 a year during two years after my death, exclusive of the year in which I die, to mulatto, *Kitty*.

·"Item. My three nephews, *John Aloysius*, *Richard James* and *Walter Edelin*, for and in consideration of the bequests I have made them, shall pay every year to negro woman, *Lucy*, and to negro woman, *Letty*, $10 for every year the said negro women may live as mentioned in the foregoing item; and my nephew, *John B. Edelin*, for and in consideration of the bequests I have left him, shall pay during the two years above mentioned to mulatto, *Kitty*, $10 for each year."

The law of *Maryland*, permitting the manumission of slaves by will, is in these words:—

Act of 1796, ch. 67, sec. 13—"that from and after the passage of this act, it shall and may be lawful for every person or persons capable in law, to make a valid will and testament—to grant freedom to, and effect the manumission of any slave or slaves belonging to such person or persons, by his, her or their last will and testament; and such manumission of any slave or slaves may be made to take effect at the death of the testator or testators, or at such other periods as may be limited in such last will and testament; provided always, that no manumission hereafter to be made by last will and testament, shall

be effectual to give freedom to any slave or slaves, if the same shall be in prejudice of creditors; nor unless the said slave or slaves shall be under the age of forty-five years, and able to work and gain a sufficient maintenance and livelihood at the time the freedom given shall commence."

Under the aforegoing circumstances, the court say, " the question to be decided is, were the defendants manumitted in prejudice of creditors? And we will first consider it by inquiring what effect the words, 'and after my debts and funeral charges are paid, I devise and bequeath,' have, to charge the real estate of the testator with the payment of debts, in the event of there not being a sufficiency of personal estate to pay them, without the manumitted slaves. Without any construction of our own upon these words, the effect of them to charge the real estate is settled, by decisions which are uncontested, and cannot be controverted." And a great number of *English* authorities are referred to in support of such a constructive charge. The establishment of this principle of the law of *England,* no lawyer at the present day could have the hardihood to deny; but if it were a new question, and courts of justice in that country were not, in their anxious desire for the protection of creditors, willing to lay hold of almost any thing to make real estate of a deceased debtor liable for the payment of his simple contract debts, as it is for those of a higher nature, and answerable in their entirety for both; it might well be doubted, whether such a principle could be sustained on the ground assumed for it, to wit—the intention of the testator deduced from the words referred to, as used in his will; as perhaps in ninety-nine cases out of a hundred, where the testator is not his own scrivener, they are the words of the scrivener, not of the testator, introduced as a mere formal part of the will, as to which the testator has neither been consulted or given any direction.

But in *Maryland,* since the act of 1785, ch. 72, the insertion of these words in a will are wholly immaterial and inoperative, as that act of Assembly renders the real estate in aid of the personalty equally liable for the payment of debts, whether those words be contained in the will or not; and whether the

deceased die testate or intestate. Since the act of 1785, in *Maryland*, therefore, no deduction as to any intention of the testator in relation to such a charge, can be deduced from them; they are words of almost unmeaning form in the introductory part of a will, and rarely of any import.

But what aid does it impart to the cause of the defendants in *Fenwick vs. Chapman*, if the words relied on do create a charge on the testatrix's real estate? The opinion of the Supreme Court furnishes no solution to such an inquiry. Although the words " relied on" in the will may make the debts a charge upon the realty, it does not thence follow that it is primarily applicable to their payment. In equity, it is well established that the personal estate is the natural and primary fund for the payment of debts and legacies, and even where they are expressly charged upon the real estate, descending or devised; and that the real estate is only to be resorted to as an auxiliary fund, after the personalty has been exhausted. For this unquestionable general principle—if authorities be necessary— they may be found in *Stevens* and *Stevens vs. Gregg*, 10 *Gill & John.* 147. *Simmons vs. Drury*, 2 *Gill & John.* 32. *Lupton vs. Lupton*, 2 *Johns. C. R.* 628, and 2 *Story's Eq. S.* 1246.

Proceeding in its opinion, the Supreme Court say: " but leaving out of view the words in the will, ' and after my debts and funeral charges are paid,' I devise and bequeath as follows:" And the authorities which have been cited to show that they make a charge upon the real estate for the payment of debts, would there not be a charge upon the real estate for the payment of debts, if it is manifest from the will that it was the intention of the testatrix, that the manumitting clause in her will was to take place, or to have effect at all events? The general rule is, that the personal estate of a testator shall, in all cases, be primarily applied in discharge of *his personal debts or general legacy*, unless he, by express words or manifest intention, exempt it. The testator may exempt a part of it by making it a particular legacy, or the whole of it, either by express words or plain manifest intention, *by giving it* as a specific legacy. And in support of this statement, a variety of

cases are cited; all of which are from Chancery Reports, and wholly inapplicable to the case then the subject of review in the Supreme Court, where the proceedings were at law, not in equity. In the tribunals of the latter, a testator may exempt his personal estate, or any portion of it, from the payment of his debts, by charging them upon his real estate—by a sale of which, they are to be satisfied. And the interests of creditors are abundantly protected by such equitable proceedings. They may be subjected to a temporary delay in the recovery of their claims, but all their just rights are preserved inviolate; to hazard or loss, they are in no wise subjected.

Upon the application of a proper party in interest to a Court of Chancery for relief, what is its course of proceeding? Does it, like the Circuit Court, take testimony or receive admissions from the executor; that the real estate is sufficient for the payment of the debts of the testatrix,—and upon being satisfied thereof, ratify the exemption of the personal estate; legalize or rather adjudicate its disposition, as directed by the will, and there terminate its exercise of power over the subject matter, and leave the creditors to seek the recovery of their just debts as best they may? It would cease to deserve the name of a court of equity, if with the powers it possesses, it would thus violate and trample upon the rights of creditors. Its course of proceeding would have been as widely different from that pursued by the Circuit Court, as justice differs from injustice.

It would, in the first place, upon the parties in interest appearing before it, have suspended all proceedings at law until all obstacles were removed, which prevented the court of law from doing full and equal justice to all parties. It would then have decreed a sale of the real estate charged with the payment of debts, and applied the proceeds of sales to their satisfaction or extinguishment. And if manumitted slaves were the persons seeking relief, from their freedom being withheld on the ground of unsatisfied creditors, the obstacle would have been removed, and the successful prosecution of their petition for freedom would be the necessary result. By such an appeal

to a Court of Chancery, both the manumitted slaves and the creditors are subjected to some inconvenience, by the temporary suspension of the gratification of their rights. But this is the result of necessity, and is the unavoidable tax imposed upon the parties, as the price of the attainment of full and equal justice.

. We do not suppose that the object of the Supreme Court in citing this imposing array of equity cases, to prove that in bar of a creditor's pursuit thereof in a court of law, in a suit against the executor, the testator can, by express words or plain manifest intention in his will, or by giving it as a specific legacy, exempt the whole or any part of his personal estate, from liability for the payment of his debts. And yet it is somewhat difficult to comprehend for what other purpose such a citation was made in the case before it. But if such was the object of the Supreme Court, we must be permitted to dissent in toto from any such doctrine.

Neither in *England*, nor in this State—nor, it is believed, in any other State of the Union, where the principles of law and equity are administered by separate and distinct tribunals, and their distinctive jurisdictions exercised accordingly, unless it be by legislative enactment, can any such power be exerted by a testator. If attempted, it can only be made available by the interposition of a court of equity—the peculiar powers of which are such, that it can effectuate the intention of the testator, and protect the interests of all concerned, without unjustly or unreasonably impairing or controlling the rights of any.

A mere court of law possesses and can exert no such powers. To sustain this doctrine of the Supreme Court, no authority supporting it has been adduced; and it is believed that none can be found, or it would have appeared in the court's opinion, which is evincive of so much labor and research.

If we are right on this question of jurisdiction, and upon it we cannot conceive in what we have erred, it is manifest that the Circuit Court were in error in their decision of the case of *Fenwick vs. Chapman,* and the judgment of affirmance thereof by the Supreme Court, is obnoxious to the same infirmity.

But to proceed with the further examination of this opinion of the Supreme Court, it cites another case in equity of *Jones vs. Selby, H.* 1709, *Pr. in Ch.* 288, as proving that " where the testator's intention clearly appears, that a legacy should be paid at all events, the real estate is made liable on a deficiency of personal assets." "That such clear intention of the testator will charge the real estate, is also decided by authority."

"Was it clearly the intention of the testator that these defendants should be free at all events, so far as she had power to make them so under the law of *Maryland?* We think it was; and the conclusion is sustained by the words of the manumiting clause of the will, by the provision which she makes of a place for their residence—by the annuities which are bequeathed to some of them—the manner in which they are made; and above all, we say, by the nature of manumission itself. After naming the slaves her language is: "*I do hereby declare them free at and after my death; and they shall have the right to live in and occupy the back room in the house and lot I give and bequeath to my nephew, Richard James Edelin.*" And the devise of that house and lot to *Richard James Edelin,* (the now plaintiff in error,) is made with *this proviso,* "*that the negroes which are hereinafter mentioned to be free, to live in the back room of said house.*" "In confirmation, too, of its having been the intention of the testatrix, that these negroes were to be free at all events, it is worthy of remark, that the effective words of manumission are in strict conformity with, or a repetition in part of these words in the statute of *Maryland;* "and such manumission of any slave or slaves may be made to take effect at the death of the testator." "But the testatrix, after declaring these negroes to be free at and after her death, provides for them a residence; and the measure of her benevolence being unexhausted, she bequeaths to some of them annuities, or pecuniary legacies; two of them as charges upon her estate, and the rest she directs to be paid by her devisees and nephews, in consideration of the bequests she had made to them. Can it be supposed by any one, that such provisions would have been made by the testatrix for the manumitted

slaves, if it had not been her intention, that they should be free at her death at all events? We think that no one will answer the enquiry in the negative."

With great respect to the propounders of this interrogative, it is believed that without evincing any great degree of moral courage or hardihood, a negative answer might have been given to it. The natural presumption, as to the intention of every testator, unless the contrary appears upon the face of the will, is that all his devises, bequests and directions, shall be gratified and conformed to. He assumes himself to be in a condition to make them. In contemplation of law, no presumption arises, independently of what appears on the face of the will, that he designed the gratification of any one of his expressed objects or designs more than another, except that he is presumed to know, or his last will and testament is to be construed as if he did know the established principle of law; that in case of a deficiency of assets, specific have priority in payment over general legacies; and that all specific legacies in this respect, stand upon the same footing, unless otherwise provided for in the will by express terms, or resulting from an implication, so necessarily flowing from the provisions of the will, as to be tantamount to the use of express terms; and that debts and legacies are payable out of the personal estate, and are not by the will chargeable upon the real estate of the testator, unless by the express terms of the will, or an implication arising thereon, which is equivalent evidence of the testator's intention to make the charge, that the use of express terms for that purpose would be.

Let us now see what are the provisions in the will, which in the opinion of the Supreme Court, so conclusively demonstrate that the testatrix intended the legacy of freedom to her negroes, should take effect at all events; that is even although it might operate to defeat every other clause and provision in the will. The testatrix providing for them a place of residence, and giving some of them annuities by the will. Is it possible that circumstances so light and inconclusive, could have such an all-controlling influence on the will of the testatrix, and the

interests of those who were to have derived benefits under it? Might it not, with almost the same propriety, be insisted that if a testatrix gave by will, to a destitute relative, a room in one of her houses devised to another, and gave to her also annuities, that such provision made for this relative, must be secured to her "at all events," having priority over every other devise and bequests contained in the will?

The dangerous consequences, and utter uncertainty that would be introduced in the ascertainment of rights, derived under last wills and testaments, by the introduction of such latitudinarian principles of construction, must at once present themselves to the mind of every lawyer. But it is not unworthy of notice, that no annuities were given to either of the petitioners in *Fenwick vs. Chapman.*

Is it not perfectly rational to suppose, that the question as to priority between the devises and bequests in her will, never occurred to the mind of the testatrix, and not having formed any intention upon the subject, she designed no expressed or implied intimation thereof?

How any deduction can be drawn, that freedom, "at all events," was intended by the testatrix from the fact, "that the effective words of manumission are in strict conformity with, or a repetition in part of these words in the statute of *Maryland:*" "and such manumission of any slave or slaves may be made to take effect at the death of the testator," we are wholly at a loss to discover. By the act of 1752, ch. 1, the power of manumitting slaves by last will and testament, was taken away from slave-holders—which prohibition continued until a few years before the act of 1796, ch. 67, was passed—which latter act permanently restored the right.

When, therefore, a testator, acting under the authority conferred by the act, used a portion of the very words of the law, which bestowed the power under which he was acting, what possible inference can be deduced from it, but that he was manumitting his slave in accordance with the act of Assembly? Whether the slave was to be free "at all events," or on what terms his freedom was given, as far as concerned the

41   v.6

insertion of those words in the will, depended entirely upon the true construction of the act of Assembly.

Suppose the act of 1752, instead of prohibiting testamentary manumission, had prohibited all testamentary bequests of slaves, leaving them, as they would be, assets for the payment of his debts: and the act of 1796 had removed the prohibition, and given power to slave-holders to make such bequests, with the same proviso against prejudice to creditors, that is appended to the clause of testamentary manumission by the act of 1796; could it be successfully contended that such bequests carried rights and priorities to their legatees, which were paramount to the rights of other specific legatees of personal property bequeathed by the will? And not only so—but that without any expressions in the will sanctioning such a priority, it must be assumed as the intention of the testator that, if necessary for that purpose, every other clause and provision in his will must be defeated, and the whole of the testator's real and other personal estate must be applied to the payment of his debts, in order that the specific legatees of the slaves might be protected in the enjoyment of their legacies? We think such could not be the design of such an act of Assembly, nor the intention of the testator in making such a bequest under it. The proviso to prevent prejudice to creditors, was inserted from a superabundant anxiety for their protection, and to prevent any possible construction being given to the act of Assembly, by which the rights of creditors might be impaired. The office of a proviso as thus used, is not to enlarge or extend the operation of an enactment, to which it is appendant; but rather to qualify and restrain it. If we are right in regard to the construction that would be given to such a supposititious act of Assembly, we can see no reason why a like construction should not be given to the clause of the act of 1796, in relation to testamentary manumission.

The Supreme Court next say, "but without such assistance from a will to collect the intention of a testator, the nature of the thing directed to be done may clearly show that it is to be done at all events, so as to make real estate liable for the

payment of debts, on a deficiency of personal assets. As for instance, when the thing to be done cannot be partially performed by the executors, without defeating altogether the intention which directs it, and the thing itself. Manumission to take effect at the death of the testator, is of that character. What is manumission? *It is the giving of liberty to one who has been in just servitude, with the power of acting, except as restrained by law.* And when this liberty is given in absolute terms, by will, under the law of *Maryland,* it can only be defeated by the person conferring it, having done it in prejudice of creditors, or by standing in the other predicament of the law, of being over forty-five years of age, and being unable to work and gain a livelihood at the time the freedom given shall commence."

What is meant by this last recital from the opinion of the Supreme Court, we are not perfectly sure that we understand. If the meaning be, that upon the death of the testatrix, the manumitted negroes were freed from the custody and control of the executor, and entitled to go at large as persons entitled to their freedom, until the creditors should show that the manumission was to their prejudice, then we must be permitted to say, that such a construction of the act of 1796 is directly opposed to that which has been given to it, and been practised under it in *Maryland,* from the day of its passage to the present day. Negroes, by will declared to be manumitted from the death of a testator, or at any future time, are as regularly taken possession of, and held in bondage by the executor, and appraised at their full value as slaves for life, and returned in the inventory as part of the property of the deceased, as they would be if no clause of manumission had been inserted in the will. And if a petition for freedom were filed by such manumitted slaves no court in *Maryland* would award to them their freedom,—and thus release the executor from responsibility on their account, until the time had elapsed within which the creditors were warned to bring in their claims, and the executor was required to settle an account of his administration with the Orphans court: and not even then, if

without any default in the executor, the estate is so far unsettled, (as by the pendency of suits against it, or the inability to complete collections on account of it,) that the court are not perfectly satisfied, that the liberation of the manumitted slaves can work no prejudice to the creditors.   Such a simultaneous construction of the act of 1796 having prevailed for upwards of fifty years, this court would not depart from it, but upon much stronger reasons than has yet been urged for doing so.   For the, to us, novel principle, relied on as resulting from a legacy being made to take effect at the death of the testator, no authority has been produced.   But if an authority be deemed necessary to prove the contrary, it may be found in 2 *Williams on Executors,* 979, where, in speaking of priority in the payment of legacies, it is stated, " but where the expressions are ambiguous, and do not mark with certainty the testator's intention, no priority can be allowed; therefore it is not sufficient that the testator gives a direction, as to a general legacy, to his wife that it shall be paid, immediately after his death, out of the first monies that shall be received by the executor: this will not give a priority to other general legatees."

The design of the legislature in declaring, " that such manumission of any slave or slaves may be made to take effect at the death of the testator or testators, or at such other periods as may be limited in such last will and testament," was not to indicate any priority in regard to such manumissions; but to put an end to a doubt which then prevailed, whether a deed or will could give freedom to a slave, to take effect in futuro. If a testator, by his will, manumit his slaves, without naming any time at which they are to be free, they are entitled to their freedom at the same time with those declared to be free at the testator's death, and to the same inferences and presumptions in their favor.

The Supreme Court have labored at great length, and by a reference to a host of authorities to prove that the testatrix's land is subject to a charge for the payment of debts.   But that is not sufficient, in any degree, to sustain the deductions drawn from it in favor of the defendants in error;—such a charge

being in its nature, merely auxiliary to the personal fund. It must be shown that it is chargeable with legacies also; or at least that it is primarily liable for debts, to the exoneration of this legacy of manumission. What is required to charge the realty, to the exemption of the personal estate in equity, is distinctly stated in one of the cases referred to by the Supreme Court. *Burton vs. Knowlton, 3 Vez.* 107. "I need not state the principles which have been so often commented on, and are so fully laid down in the *Duke of Arcaster vs. Mayer*, that unless there are words, not express, but tantamount to express, so as to afford demonstration plain, that the personal estate is intended to be given as a specific legacy, and exempt from the payment of debts; it shall be taken subject to them." Where is this "demonstration plain," of such an intention in the will of *Mrs. Edelin?* We have endeavored to shew that it is not to be found in the slight circumstances relied on as showing it. But say the Supreme Court, it necessarily results from the nature of testamentary manumission itself, under the act of 1796. In this assertion, we cannot concur. Correctly to determine the issue between us, it is necessary to ascertain what was the object of the act of 1796, in authorizing testamentary emancipation? It was not to over-ride, defeat, and control all other powers and intents possessed by the testator—and all rights of other persons possessed *aliunde*, or acquired under the will—but simply to restore a power taken away from him by the act of 1752, ch. 1, and to confer on him the same power to give by last will and testament, the slave or his services, to the slave himself, that he previously enjoyed of making such a bequest to any other person.

To give to this emancipating power under the act of 1796, its true construction—that to which it was entitled at the date of its passage—we must bear in mind that slavery is one of the civil institutions of *Maryland*, and that its previous acts of the legislature upon the subject, sedulously protected the interests of slave-holders; and that whilst it tolerated emancipation, under special guards, limitations and restrictions, it evinced no disposition to encourage its extension: it conferred

no new favors or immunities upon the liberated slaves, or their former masters. All that the legislature designed by that part of the act of 1796, which relates to the manumission of slaves by last will and testament, was to relieve it from the prohibition imposed on it by the act of 1752. It intended to confer on it no other or greater mark of its favor. That such transcendental priorities, presumptions and rights were, by the act of 1796, or the intention of those who exercised the powers derived under it, granted to testamentary emancipation, is a discovery of more modern times, and never entered the imagination of the General Assembly, by which the law was passed, or of those who acted under it. If such feelings and intentions are to be imputed to testators, the evidence thereof would have appeared by express terms in the will; or what would be more natural and consistent, by deeds of manumission, executed in their life-time.

" But (say the Supreme Court,) what meaning shall be given to the words of the statute of *Maryland*, that no manumission hereafter to be made by last will and testament, shall be effectual to give freedom to any slave or slaves, if the same shall be in prejudice of creditors? It is, that the manumittor must not be insolvent."

If such had been the meaning of the legislature, it would have used apt words to express it. Instead of the language used in the law, the enactment would have been somewhat as follows: provided that no insolvent person shall manumit his slaves by last will and testament. Such was not the meaning of the General Assembly; if it were, in what a deplorable condition would it leave creditors. An insolvent is one who has not property enough to pay all his debts. A testator then, under this new interpretation given by the Supreme Court to our *Maryland* act of 1796, who owned negroes worth $10,000, and $100 worth of other property, and owed debts amounting to $10,000, not being insolvent, might manumit all his slaves, and no protection or proviso whatever was contained in the act of 1796, for the benefit of creditors. Can it for one moment be believed, that such was the intention

of the legislature, or the true interpretation of its enactment? But if it be suggested that we misinterpret the meaning of the Supreme Court in its use of the word insolvent, that its meaning was, in the use of that term, that the testator's property, exclusive of the manumitted slaves, was not sufficient to pay his debts,—and therefore he had no power, under the act of 1796, to manumit his slaves. By such a construction, the power of testamentary manumission would be greatly curtailed; and hundreds and hundreds of those who are legally enjoying their freedom under the exercise of that power, would now have been slaves.

As for example, if a testator owned negroes, whom he manumitted, worth $10,000, and other property to the amount of $50, and owed debts to the amount of $100, his manumission of slaves was void, although the executor, by the hire of the negroes for a few months, might have paid off all the debts of the testator. In the event of a deficiency of the testator's assets for the payment of his debts, the executor, under the direction of the Orphans court, may, if the creditors are willing to delay the payment of their claims, hire out the manumitted slaves, until the hire of each, as a specific legatee, shall raise his proportionate contribution towards the payment of debts; or he may sell the manumitted slaves for such length of time as shall be necessary to raise the amount of their respective contribution; or in the event of its being necessary for that purpose, he may sell the manumitted slaves as slaves for life. And this construction of the powers of the executor, is not only required for the protection of creditors, but is essentially beneficial, and just, towards the manumitted slaves themselves. These proceedings of the Orphans court being *ex parte*, their legality is always open for examination, when they are relied upon, either in a court of law or of equity.

The numerous inconsistences and disastrous consequences which the Supreme Court has enumerated, as resulting from any other construction of the act of 1796, than that which they have given to it, exist but in imagination, and are all removed

by the construction which we have given, by which the rights of all parties are secured and protected.

The act of 1796 does not require, and it was not necessary to effectuate any object of its framers, that it should require, that where real assets are charged with the payment of debts, either as a primary or auxiliary fund, and slaves are manumitted by the testator, that he should be compelled to file a bill in Chancery for a sale of the real estate. How can he allege that he is remediless without the aid of a court of equity, when his remedy at law is available and complete. But this allegation may with truth be emphatically made by manumitted slaves, where such charge has been made, and they are about to be sold for the payment of debts, which in equity ought to be paid out of the realty. A charge on real estate for the payment of debts or legacies, is peculiarly a subject of equitable jurisdiction in *Maryland*, and of it a court of law can take no cognizance. The manumitted slaves, then, are the proper party complainants to go into a court of equity to enforce the charge, and seek the sale of the real estate—the proceeds of which should be applied to their exoneration. Upon their application, the court of equity will, if necessary, arrest the arm of the pursuing creditor at law, decree the required sale, and apply its proceeds to the satisfaction of the testator's debts; and then do what? not decree that the manumitted slaves shall be free and discharged from bondage. To do this, a court of equity has no more power than the Orphans court. But the manumitted slave is left to either one or the other of the only two ways, by which his right to freedom can be consummated. Obtain the assent of the executor to the legacy of freedom, which has been bequeathed to him, or file his petition in the County Court as a court of law, where the rights of creditors having ceased to interpose any barrier to his claim, his freedom will be secured to him by the judgment of the County Court. By such a course of proceeding, justice will be done to all parties concerned; the just rights of all amply provided for and protected, and all the objects of

the act of 1796, in relation to testamentary manumission, fully carried out and accomplished.

In a further part of its opinion, the Supreme Court say—"the decision in the case from 2 *Harris & Gill*, 1, of negro *George et al. vs. Corse's administrator*, was urged in argument, in opposition to the opinions just expressed. In that case, the petitioners claimed their freedom, in virtue of the will and testament of their master, *James Corse*. The manumitting clause of the will gives freedom to some of the slaves at the testator's death, and to others when they shall have arrived at particular ages; and the testator further says, if his personal estate, exclusive of the negroes, should not be sufficient to discharge all his just debts, then my will is, that my executor or administrator, as the case may be, may sell so much of my real estate as may pay my debts, so as to leave my negroes free, as before stated." "The testator made specific devises of real estate in fee to his son,—and devises and bequeaths to his brother, *U. Corse*, the residue of his estate, both real and personal, with the unexpired time of the negro girls and boys, as designated in the first clause of the will, and he appointed *U. Corse* executor. The case was submitted to the jury in the *Kent* County Court, upon a statement of facts; and with instructions from the judge, that if the jury believed the facts, they must find a verdict for the defendant. The verdict and judgment being against petitioners, they appealed. In the statement of facts, it is admitted that the personal estate of the testator, either including or excluding his negroes, was not, at the time of the execution of his will, nor at any time after, sufficient to pay his debts—but that his real estate, exclusive of the negroes, was sufficient to pay all his debts and funeral charges."

" Upon appeal, three judges decided to affirm the judgment, upon the ground, that the question of the existence of a sufficiency of real assets to pay the debts of the testator, never can be tried as an issue between the executor or administrator only, without prejudice to creditors. That it was an issue to which the creditors were no party, and to protect whose in-

terest nobody appears. And the court further says, that the admissions made by the appellee, he was unauthorized to make, and the court incompetent to pass judgment upon the facts they contained—not being matters in issue in the cause."

The court further say, " as far as relates to the personalty, the executor or administrator is competent to act for all concerned ; but in trying the facts, whether there be assets by descent in the hands of the heir, and what is the amount thereof, he has no interest, either personally, or in right of representation." With all due respect for the judges deciding that cause, their opinions cannot command our assent.

"We think with Judge *Cranch*, and use his language in regard to that decision, when he gave his opinion in the Circuit Court in that case. The judge says: "when lands are devised to the executor, to be sold for the payment of debts, as when the power is given to the executor to sell them, the lands are as much a fund in his hands for that purpose, as the goods and chattels ; and he represents the creditors, in regard to the lands, so far as their interests are concerned, as much as he does in regard to the personal estate,—and the creditors are as much a party in the issue in respect of the lands, as they are in respect of the goods and chattels. When he is charged with the sale of his testator's lands for payment of his debts, he is as much bound to inquire in regard to the lands, as he is in regard to the personal estate ; for it is his duty to execute the whole of his testator's will,—and in such a case, the creditors have as good a right to look to the land, through him, for the payment of those debts, as they have to look to the goods and chattels through him."

If it were the design of Judge *Cranch,* as from the portion of his opinion quoted, we should be disposed to infer that it was, or how was it evidence of the error in deciding it, to state that the lands charged were either as lands—or as money, the proceeds of the sale thereof a fund in the hands of the defendant, the administrator of *Corse,* we must be excused for saying, that such an assumption is wholly unwarranted by the admission of facts in the record of that case. *Thomas C. Kennard,* the

administrator of *Corse*, the testator, was the defendant,—and there was no devise to him of any lands to be sold for the payment of debts, or any other purpose; nor was there any admission or proof that he had ever been in the possession of any lands of the testator, or of the proceeds of the sale thereof, or that any attempt had ever been made by him, or any body else, to sell the testator's lands for the payment of his debts. How then, either at law, in equity, or in fact, can it be said, that the lands or real estate are assets in his hands for the payment of debts; he possessed but a naked, unexecuted power, and could only be chargeable by its execution. The Supreme Court proceeds, by many supposititious cases, to sustain this adopted opinion of Judge *Cranch*, to the imputed effect of none of which *in proceedings at law*, can we yield our assent. And as an argument, which it appears to consider as established by its statement, it says: " but it may be said the difference in the cases supposed, and that which existed is, that in the first the assets were in hand, and in the other, were to be made by a sale of the land. The difference makes nothing against the argument; for the value of the land can be as well ascertained by proof as it can be by the executor's sale; and when he admits the value to be sufficient to pay debts, he does, in truth, do no more than is done when he admits the existence of a sufficiency of personal assets, but unsold to pay debts."

" As between himself and another, his admission may surely bind him in that other's favor, as well in regard to assets to be made from land, as in regard to personal assets undisposed of. In the latter case, there is as much a question of the sufficiency of assets, as there is in the case when assets are to be made by the sale of land; and so far as creditors are concerned in a case of manumission, the reason for not trying the issue between a petitioner and an executor, is as strong in an inquiry of sufficiency of personal assets, as in one of real assets."

To these results, the reasoning of the Supreme Court necessarily led,—and if its premises were true, and its conclusions warranted by them, they would establish some novel, extraordinary, and startling propositions.

" The difference," (says the Supreme Court,) " makes nothing against the argument, for the value of the land can be as well ascertained as it can be by the executor's sale."

If this be true, then an execution levied upon property, valued by sworn appraisers at the amount of debt and costs, though it subsequently sell at but half the amount, is as much a full satisfaction of the creditor's demand, is as beneficial to him, as if the whole amount had been realized, or received from the sale of the property seized. Does not every day's experience demonstrate that nothing is more uncertain and fallacious than the estimated value of land to be sold at public auction? The records of Chancery sales, and sales under executions from courts of law, and the testimony frequently offered in relation to them, demonstrate the truth of this assertion. Are not the rights of a creditor impaired? Is he not prejudiced? If, instead of being paid the amount of his debt, or the amount thereof actually realized by the sale of the lands charged with its payment, he is stripped of his legal rights upon a fund which he knows to be sufficient, and left as his only security to pursue a fund which may, or may not, produce enough for the satisfaction of his claim, upon the proof of a witness or witnesses that in his or their opinion upon a public sale, it will not prove inadequate. To what does the admission of the administrator amount? Nothing more than the mere expression of his opinion. And should he ultimately sell the lands and be called to an account in a court of equity, for what would he be held accountable? For the price at which the lands sold, and nothing more. And this statement of the administrator, not made under oath, is regarded as sufficient proof to establish a matter of fact by which creditors may be prejudiced, their legal rights taken away, and their equitable rights, if they have any, greatly impaired. For such an invasion of the legal rights of creditors, even by a court of equity, it is believed no precedent can be found. But this is not all. From whom have the Supreme Court received this statement, which, though not under oath, it regards as proof sufficient to destroy the rights of creditors? From one who, if offered as a witness, would

not be listened to for a moment. By the declared opinion of the Supreme Court, he has assented to the bequest of freedom to the slaves, and can never afterwards reclaim them. And what is the necessary result of such an act of the administrator, if he fail to establish the fact of his alleged justification as now offered to be proved by himself? Why, that, as regards creditors, he has committed a *devastavit* to the amount of the value of the manumitted slaves, can a more conclusive and undeniable objection to the competency of such a witness be well imagined?

" And (say the Supreme Court) when he admits the value to be sufficient to pay debts, he does, in truth, do no more than is done when he admits the existence of a sufficiency of personal assets, but unsold, to pay debts."

Unquestionably true it is, that he does no more; but, as we conceive, he does much less. In the first case, *ex natura rei*, he merely expresses an opinion, for the consequences of which no court of equity would ultimately hold him responsible, and for which neither he nor his securities on his testamentary bond, could be held answerable. But, in the second case, the assets are in his hands, it was his duty to have sold them, to be prepared to make them available to the payment of the debts of the testator. And the law presumes that he has done his duty, and that the personal assets are in his hands accordingly, and receives his admission in accordance with the presumption. If it be not so, he is guilty of misfeasance, and by his admission, charges both himself and his securities in his testamentary bond, with the consequence resulting therefrom. That is, both he and his securities are liable to the creditors, as for a *devastavit*, to the extent to which the creditors were prejudiced by reason of the admission. On the contrary, the statement of facts agreed on, repels any presumption that the administrator, the defendant, is, or ever was, in possession of any part of the real estate or the proceeds of sale thereof, or that any portion of it ever was sold, or attempted to be sold, for the payment of debts. His admission, therefore, could not be otherwise regarded, either at

law or in equity, than as his opinion of the value of his testator's real estate, then in the hands of his devisees.

But suppose it were otherwise, and he had admitted that he had sold the real estate, and that he was chargeable with the proceeds of sale. Is it not a prejudice to creditors to lessen the securities they have for the payment of their debts? To take from them a fund, the faithful application of which to the payment of their debts, is secured not only by the responsibility of the defendant himself, but of the two securities in the testamentary bond, and to leave them to seek satisfaction of their claims from a fund, for which the defendant's ability to pay is their only security? We think it is. That money, thus coming into the hands of the executor, or administrator, from his sale of real estate for the payment of debts, is not covered by the testamentary or administration bond, cannot be denied. To prove that such was the law of *Maryland* anterior to the year 1831, when, by statutory enactment, the law was changed, it is only necessary to refer to the act 1831, ch. 315, sec. 10.

But another and a conclusive reason why, in a proceeding in a court of law, (of which character is a petition for freedom,) the admission of an executor, or administrator, as to the value of real assets charged with the payment of debts, cannot be regarded as a ground for adjudicating the freedom of slaves, is because such real estate, whether in the hands of the executor or administrator, or not, and whether sold and in the hands of the executor or administrator, or not, is equitable and not legal assets, which in a court of law has no legal entity, and is of no value; is not recognized by it; and of it no cognizance can be taken. Courts of equity only, previous to the year 1831, could administer equitable assets; there only could their value be estimated; and there only could they be sought, or remedies be prosecuted against them. For this principle, it is deemed unnecessary to refer to the numerous authorities that might be arrayed for its establishment, and we are content to extract a few lines upon the subject from the 2d vol. of *Williams on Executors*. In page 1196, in speaking of legal assets, that learned writer describes them as being "such as may be

reached at law, and such as a creditor, suing the executor in an action at law for a debt due from the testator, might bring forward, in evidence, on an issue joined on the executor's plea of *plene administravit.*" In speaking of equitable assets, he says they "are not recognized as assets at law." "That legal assets are such as are liable to debts in the temporal courts and legacies in the spiritual, by course of law; equitable assets are such as are liable only by the help of a court of equity." And in page 1198, of the same writer, it is stated, "with respect to that portion of the estate of an executor, or administrator, which consists of the proceeds of sale of real property, it is now fully settled, that such proceeds are equitable, not legal assets."

On whom the burden rests of proving the amount of debts, or sufficiency, or insufficiency of assets, on a petition for freedom, it is unnecessary for us to express any opinion. The admissions of the parties, or full proof in all the cases before us, and to which we have adverted, having occluded the consideration of any such questions.

If we rightly understand the doctrines asserted by the Supreme Court in *Fenwick vs. Chapman,* a slave whose manumission by the terms of the will is to take effect at the testator's death, may forthwith file his petition for freedom in the County Court, and that judgment must be awarded in his favor; if, on the trial, it be proved to the satisfaction of the court or jury, as the case may be, that the testator left other personal and real estate, no matter how, or to whom bequeathed or devised, sufficient for the payment of his debts; although it might subsequently happen that the testator had no title to such real or personal property; or that upon a subsequent sale of it, the proceeds of sale might not be a tythe of its value in proof to the court and jury on the trial of the petition for freedom; and that such proceedings and results are not in prejudice of creditors within the true intent and meaning of the act of 1796; because the judgment of the County Court liberating the slaves, may be set aside, if obtained, "without foundation in fact, or in fraud, or mistake, upon the creditor's showing either, in a

proceeding in equity to which the manumitted slaves, the executors, and all persons interested have been made parties in which there may be a review of the entire administration of the estate, of the conduct of the executor, and that of *creditors* in regard to the estate, and in regard to the vigilance of the one in payment, and of the others in the pursuit of their debts." What was the alternative showing of the creditors, indicated by the court's use of the word " either," is not stated in the report of the court's opinion in 9 *Peters*, and we have no means of ascertaining what it was. Whether such a judgment could be vacated with the certainty and facility with which it appears to be thought that it could be done, it is deemed unnecessary to inquire ; our design is only to examine the effects of such vacation upon the rights of creditors. If regarded theoretically and as a judicial abstraction, it might perhaps be esteemed as healing the wounds inflicted on the rights of creditors by the judgment of the County Court, emancipating the petitioning slaves. But if practically considered, it is stripped of all its conservative influence on the rights of creditors, who by the proceedings of the County Court, are not only prejudiced, but have had all hopes of payment of the unsatisfied portions of their claims virtually extinguished. To prove this, all that is necessary is to state what, in point of fact, are the effects of the vacation of the judgment complained of; and what were the anticipated results. The latter were, that the emancipated negroes would be again restored to the possession of the executors, and be applied to the payment of the debts of the creditors. The former are, that the manumitted slaves having fled from the State of *Maryland* to some place of perfect security against the reclamation of the executor, will never be made available for the claims of creditors; but forever remain in the enjoyment of their freedom, unlawfully obtained, " *to* the prejudice of creditors," and in contravention of the manifest intent of the act of 1796. That the executor and his securities, under such circumstances, would, both at law and in equity, be exonerated from all accountability for the manumitted slaves, or their value, it surely cannot be necessary to assert.

The legislature, in passing laws, are not governed by mere theories or legal abstractions, but are presumed, as men of experience and judgment, to foresee the natural and probable consequences of their enactments. If so, could it for one moment have deen doubted that upon the creditor's filing a bill for the annulment of the judgment of the County Court, and the summoning and apprising of the manumitted slaves to answer the bill, when in possession of such testimonials of their right to freedom as would have protected them from arrest or molestation in a journey to any part of the world, that the petitioners would not at once have taken their flight to some remote place of security, from which their reduction to a state of slavery was out of the question. It never was the design of the General Assembly, therefore, by the act of 1796, thus to prejudice the rights of creditors, by legalizing the proceedings complained of. It must be assumed of the General Assembly of *Maryland*, that it foresaw such consequences of its enactments, as were to have been anticipated upon principles of plain reason, common sense and ordinary experience. With such an assumption, we conceive the interpretation, given by the Supreme Court, to the act of 1796, cannot be reconciled.

The Supreme Court further say : " This construction too, of the words ' in prejudice of creditors,' and of obligation to go into a court of equity, is in exact conformity with that indisputable rule in equity : that, where one claimant has more than one fund to resort to, and another claimant only one, the first claimant shall resort to that fund on which the second has no lien." And for this a number of authorities are referred to, which are incontrovertible in a court of equity; but, as we conceive, are wholly inapplicable to a trial at law, as was the case of *Fenwick vs. Chapman*. None of them were decisions made in trials at law, but in those of a Court of Chancery, whose peculiar and exclusive province it is to marshal assets. The decisions above referred to, are, in our interpretation of them, nothing more' than instances in which this exclusively equitable power has been exerted. If a creditor, having two funds to which he may resort for the payment of his debt,

pursue in equity the fund, to which only another creditor has a right to resort; or if, under like circumstances, he proceed to prove his debt, under a commission of bankruptcy, a Court of Chancery will compel him to seek payment out of that fund, to which such other creditors had no right to resort. But if one of the funds be legal assets, and the other equitable assets, and the creditor is pursuing the legal assets, can a case be found where the Court of law have said, we will strip you of your legal rights, and exercising the powers of a court of equity in marshaling assets, put you to seek payment of your claim out of the equitable assets. For such an exercise of power by a court of law, either in *England*, or in *Maryland*, it is confidently believed that no precedent or authority can be found. In all such cases, or in cases of specific legatees, who are about to be deprived of their bequests, by creditors seeking payment out of the legal, instead of the equitable assets, the controlling interposition of a court of equity, is applied for, not as appears to be supposed, by the *creditor*, but by the party about to be injured by the legal remedies pursued by the creditor. This is the natural order of things; and by pursuing such a course of proceeding, no "prejudice to creditors" ensues, and the rights of all parties interested are asserted and protected.

In the case of *Fenwick vs. Chapman*, the petitioners, if the real assets were primarily liable for the payment of debts, instead of filing their petition for freedom in the County Court, ought to have filed their bill in the Court of Chancery against the executors and heirs, or devisees, as the case might be, and some of the creditors of the testatrix, to obtain a sale of the real estate for the payment of debts. By such a proceeding, the rights of all parties would have been secured, and loss or injury inflicted on nobody.

The case of *Allien vs. Sharp*, 7 *G. & J*. 96, decided nothing in relation to rights acquired under testamentary manumissions. There, the manumission was by deed duly executed, acknowledged and recorded; and the rights of creditors could not be prejudiced, unless the deed was fraudulent and void, as against

creditors; that is, persons who were creditors at the date of the deed of manumission, and who in consequence thereof, were deprived of all means of making their debts out of the property of the debtor. If at the time of its execution, the debtor was entitled to other property, amply sufficient for the payment of all just claims against him, his creditors were deprived of no legal right of which the debtor had not an unquestionably authority to divest them at any moment he saw fit, either by deed of manumission, or any other mode of disposing of the slave, that he might deem it expedient to adopt. And if the manumitting debtor had not sufficient property remaining to pay all his debts, the deed was fraudulent and void as against the creditors. But they were, in consequence thereof, divested of none of their legal rights, but enjoyed them to precisely the same extent, both at law and in equity, that they would have done had the deed been one of gift, instead of manumission. Nor would they, as appears to be supposed, be deprived of all legal remedies against the manumitted slaves in the pursuit of their claims. Having obtained judgments against their debtor, they might have seized and sold the manumitted slaves in the same manner, as if they had been any other goods or chattels fraudulently conveyed by the debtor.

It is true that in case of the debtor's death, the manumitted slaves, or other chattels fraudulently conveyed, would not have passed to his executor or administrator, because such conveyances are valid as against the debtor, and those claiming under him. In the event of such death, the creditor's only remedy is in a court of equity, where, indeed, at his election, he might have pursued it in the life-time of the debtor. Such cases of fraud being cognizable as well at law as in equity. The principles of law asserted in *Allien vs. Sharpe*, were only recognized as applicable to the facts of the case, in which they were used, and were not understood by the judges who decided it; or by this court as impairing the authority, or overruling the case of negro *George vs. Corse*. And after examining, with great deference and respect to that high tribunal, the reason-

ing and opinion of the Supreme Court, in the case of *Fenwick vs. Chapman,* we feel ourselves at liberty to say, that our confidence in the correctness of the decision of this court, in the case of negro *George vs. Corse,* remains wholly unshaken.

The decision of negro *George vs. Corse,* was not, as might be supposed from the terms in which it is spoken of, made by three judges—other judges who sat in the case non-concurring—but was the unanimous decision of all the judges who sat in the case.

In its decision in *Fenwick vs. Chapman,* the Supreme Court appear wholly to have disregarded the principle settled in its early decisions, and from time to time, oft re-asserted by it, even as late as the case of *Martin Luther vs. L. M. Borden* and others, decided at its December term, 1848, (where it was sanctioned by an unanimous opinion,) that in construing a statute of one of the *United States,* not relating to the paramount jurisdiction of the Supreme Court of the Union, it was a rule of the Supreme Court to conform to and follow that construction, which had been given to such statute by the highest judicial tribunal of the State in which it had been passed.   The reasonableness and expediency, not to say necessity, for adopting such a rule would be at once apparent to the mind of a lawyer, who would reflect upon the consequences that might reasonably be anticipated from the non-adoption of such a rule—one of its necessary tendencies, if not results, would be the total subversion of all the doctrine, as to the " *lex loci contractus.*"

The admissibility of the papers offered in evidence by the defendant, as stated in the first bill of exceptions, after the numerous decisions of this court upon the subject, is no longer a question open to discussion, either by the court or counsel. The County Court was right in overruling the petitioner's objections to the testimony offered in the first bill of exceptions.

The County Court was clearly right in refusing the petitioner's prayer in his second bill of exceptions on various grounds, any one of which was sufficient to warrant the court's refusal of the prayer.   The first is, that no evidence had been

offered of the value of any real estate of the testator,—and consequently, the court would have erred in submitting the question of such value to the finding of the jury. The second ground sustaining the court's refusal is, that neither upon the true construction of the act of 1796, nor of the will of the testator, is there any charge upon the real estate of the testator for the payment of debts, either as an auxiliary fund, or as a fund primarily liable therefor. And the third ground is, that conceding there was such a charge, and the primary liability of the real estate for the payment of the testator's debts, that a court of law has no power to enforce such a charge, or estimate the value, or take cognizance thereof,—and therefore, on a petition for freedom in the County Court, no evidence of the value of the real estate can legally be submitted to the jury, or form a subject for its determination.

The County Court was right also in its refusal of the petitioner's prayer in his third bill of exceptions, for the reasons assigned in support of the County Court's refusal of the prayer contained in the second bill of exceptions.

The County Court in like manner was right in refusing the petitioner's prayer in the fourth bill of exceptions, as well for the reasons assigned in support of that court's refusal of the prayer in the second bill of exceptions, as because there is nothing in the will of the testator to show, that the proceeds of sale of the land authorized to be sold by the testator's will, were charged with the payment of his debts or legacies.

The County Court was right too, in refusing the petitioner's prayer in the fifth bill of exceptions, because the order of the Orphans Court having directed a sale " of all and singular the residue of the goods and chattels of the deceased for the payment of his debts, (of which the manumitted slaves was a part) and it appearing by the testimony on which the prayer was predicated, that such sale was necessary for the purpose for which it was made, was an authority to sell for life the manumitted slaves, and if subsequent events, could be resorted to as showing the correctness of a previous order, that of the Orphans Court is fully justified by the fact, that the sale of the

entire personal estate, negroes and all, did not amount to a sufficient sum to discharge the testator's debts. There is nothing in the order which could be regarded as restricting the sale of the manumitted slaves to terms for years.

In refusing the latter part of this prayer of the petitioners, there cannot be error, because the facts upon which it is based, demonstrate not only the insufficiency of the legal assets, exclusive of the manumitted slaves; but that even, after their sale, the insufficiency still continued.

Our approval of the County Court's refusal of the petitioner's prayer in the sixth bill of exceptions is apparent from what we have said on the fourth bill of exceptions.

Our views, expressed on the fifth bill of exceptions sufficiently disclose our approbation of the refusal, by the court below of the prayer of the petitioners in their seventh bill of exceptions.

This court's concurrence with the County Court in its refusal to grant the petitioner's prayer in his eighth bill of exceptions appears in what we have said in regard to his second bill of exceptions.

Our opinion in this case has been extended much beyond our anticipation or design; but our apology for its length, is that many important principles of *Maryland* law are involved in it, of deep concern to creditors, manumitted slaves, and slaveholders; and, indeed to all beneficiaries and representatives of estates, the owners of which have inserted in their wills clauses for the manumission of slaves.

Entirely concurring in all the rulings of the County Court, in this case, we affirm its judgment.

**JUDGMENT AFFIRMED.**