Spencer *vs.* Negro Dennis.—1849.

PERRY SPENCER *vs.* NEGRO DENNIS.—*December*, 1849.

The case of *The State vs. Dorsey, Exc'r of Worthington*, 6 *Gill*, 388, explained and approved.

The bequest of freedom to a slave is a legacy equal to the amount of his appraised value.

The design of the acts authorising manumission of slaves, was not to foster emancipation, and thereby, as far as practicable, to put an end to slavery, but it was to enlarge the powers and privileges of masters, and to give them an authority to dispose of their slaves in a way which, otherwise, they did not possess.

There has been no material change in the views of the legislature upon the subject of slavery, since the acts of 1715, ch. 44, and 1752, ch. 1, except as to the power of testamentary manumission.

A testator, by his will, devised "that all his negroes be free at the age of thirty-eight years, provided they leave the State within thirty days after they attain said age," "and should they return to reside in the State, my will is, then, that they shall be slaves to my heirs." HELD:

That the conditions attached to this bequest of freedom, are conditions subsequent, and, being subsequent, are wholly unauthorised by the act of Assembly, and, therefore, void.

Testamentary manumission only exists in this State, by virtue of the 13th section of the act of 1796, ch. 67, and can only be exercised in pursuance of the authority thereby given.

Under this act a testator may prescribe the period when manumission shall commence, but he has no power to put an end to a state of freedom, and restore the condition of slavery.

Freedom having once vested, by no compact between the master and liberated slave, nor by any condition subsequent, attached to the gift of freedom, can a state of slavery be reproduced.    Nothing short of legislative power, duly exercised, can produce such a result.

Appeal from *Baltimore* county court.

The appellee filed his petition for freedom on the 3rd of September, 1849. The case was submitted to the court below on the following agreement of facts:

That the petitioner was the slave, for life, of *Samuel Brohawn*, of *Dorchester* county, who, by his will, executed on the 19th of August, 1831, among others, made this devise:— "*Item*.—My will and desire is, that all my negroes be free at the age of thirty-eight years, provided they leave the State of *Maryland*, and do not return therein to reside, in the course of thirty days after they arrive to the age of thirty-eight years; and should they return to reside in the State of *Maryland*, my will is, then, that they shall be slaves to my heirs." That petitioner was one of the slaves referred to in said will, and attained the age of thirty-eight years on the 19th of December, 1845, and received a certificate from the register of wills of *Dorchester* county, certifying to the fact of his freedom under said clause, which is recited therein. That in the division of the estate of said *Brohawn*, the petitioner was allotted to his widow, now the wife of the appellant. That after he attained his age of thirty-eight years, petitioner was permitted to go at large, and act as a freeman, until taken by appellant, on the 1st of August, 1849. That the appellant, some time in February, or the 1st of March last, sent for petitioner, and notified him, if he did not give security, or leave the State, he (appellant,) would sell him, as he had stayed longer than the will allowed. That if he would leave the State, he would let him go free. That petitioner made no answer to this notice. That he has never left the State, and never offered to leave it.

The court gave judgment that petitioner was entitled to his freedom, from which defendant appeals to this court.

The cause was argued before DORSEY, C. J., SPENCE, MARTIN, and FRICK, J.

By PRATT, for the appellant, and
By C. J. M. GWINN, for the appellee.

DORSEY, C. J., delivered the opinion of this court.

It is insisted, by the appellant, that the case now before us, is settled against the appellee by the decision of this court in the case of *The State vs. Dorsey, Ex. of Worthington*, 6 *Gill*, 388. Whether it be so, or not, we shall presently have occasion to examine. Some doubt having been insinuated in the argument which has just terminated, as to the correctness of the principle adjudicated in that case, it may not be out of place, at this time, to state the grounds of the court's opinion somewhat more at large than was deemed necessary when the decision of that case took place. That the legislature of *Maryland* possess the power of prohibiting testamentary manumission altogether, no lawyer would have the hardihood to deny. It did so prohibit it in 1752, and such prohibition continued for about forty years. It then restored the power, not in furtherance of any State object to be promoted by emancipation, but as restoring a privilege, merely, which for forty years had been withheld from slaveholders. It is equally undeniable, that the legislature, having the authority to deprive slaveholders of all power to make testamentary bequests of their negroes, may grant to them the right to do so, upon such terms and conditions as, in its justice and wisdom, it may see fit to prescribe. And it is equally within the scope of the legislative power, whether such terms, conditions or burdens are imposed upon the testator, the manumitted slaves, or the persons to whom they are bequeathed. In either aspect, the burdens and conditions are alike obligatory.

It is a matter of history, and of judicial cognizance, that, previously to *Worthington's* death, with a view to promote the general welfare, the State had incurred an enormous public debt, which, upon every principle of law and honor, it was bound to pay. That, to make this payment, all the property of the people of the State was bound to contribute, under legislative enactments, its just proportion of the amount to be paid; and that, had the legislature deemed it expedient to do so, it might have enacted, that no property holder should, by last will and testament, make such a disposition of his slave, or

other property, as would exempt it from its contribution of its just proportion of the public burthens. It follows, then, from these undeniable positions, that the legislature of *Maryland* had the power to pass a law imposing the tax to which the Court of Appeals have decided, that slaves, manumitted by a testator, were subjected. Of the morality and expediency of such tax, the legislature was the exclusive judge.

But is there, in point of fact, any injustice or hardship in this tax? or, have manumitted slaves any right to complain of it? We think not. When the immense debt with which *Maryland* has been burthened was created, it was doubtlessly, and correctly too, believed, that the objects accomplished by it, would operate as beneficially to labor as to property—to the laboring portion of the community, as to property holders—and proportionate benefits were anticipated to result to all. At the time this debt was created, we must assume that the legislature looked to the assessment lists of the State, and saw what property there was on which it could impose taxes, in the event of its being called on for the payment of the State debt. For the payment of its just proportion of this debt, every species of property in the State was equally liable, and ought to be made contributory in the way of taxation. A very large item in these assessment lists, was a valuation of slaves. If, then, the legislature, apprehending that the owners were about to remove their slaves without the confines of *Maryland*—beyond the reach of taxation—and, thereby, avoid all just contribution to the payment of the public debt, would it not have been justified; nay, was it not its imperative duty, as the guardian of the rights and interests of other property owners, to prohibit the removal of such slaves from the State, until they had paid into the treasury the two and a half per cent. of their value? that is, their just proportion of the public debt? That it would have been a legitimate exercise of power and duty, cannot be denied. Is it not, then, equally clear, as an act of power and duty, that the legislature, if foreseeing, as it must have done, that a great number of slaves, which ought, in justice, to be charged with the payment of their proportion of the public debt, were about

to be manumitted by their masters, and thus evade the just demands of the State, ought either to prohibit manumission altogether, or to sanction it only upon their payment of their quota of the public debt; that is, the two and a half per cent. upon their assessed values? The unmanumitted slaves remain as such, and are made to contribute ratably to the extinguishment of the public burdens. But it may be said, that the legislature has imposed no such tax upon manumission. It is true, *eo nomine*, it has not done so; yet, giving to its acts for raising revenue that liberal construction which such acts should ever receive, we think it has fully provided the appropriate remedy for such a case. It has imposed a tax of two and a half per cent. on legacies, and we regard the bequest of freedom to a slave, as a legacy equal to the amount of his appraised value. If such a bequest be not a legacy, what is it? It would puzzle the most astute and learned lawyer to find any other head, in a legal nomenclature, under which it could be classed. It was declared to be a legacy by *Chancellor Bland*, in *Hammond vs. Hammond*, 2 *Bland*, 314. "That every devise and every bequest, including the emancipation of slaves, for the gift of freedom to a slave, is a most precious, specific legacy, are specific legacies." That distinguished jurist, the late *William Pinkney*, in his celebrated speech before the General Assembly of *Maryland*, in 1789, in favor of testamentary emancipation, spoke of manumission as a "specific legacy." And this court have so treated it in the case of *Stephen Cornish vs. Jacob Wilson*, 6 *Gill*, 299.

Of what special injustice or hardships had the manumitted slavery in the case of *The State vs. Dorsey, Exc'r of Worthington*, a right to complain? They had accepted of a bequest, charged with a small and reasonable incumbrance, which ought to be discharged, and they are amply reimbursed for its imposition, by the increased value of their labor resulting from the incumbrance.

The acts of Assembly of *Maryland*, authorising the manumission of slaves, were not passed in consequence of any legislative hostility to slavery, or in gratification of any general wish

or policy to diminish or destroy it; or to confer benefits upon slaves, and promote their comforts and happiness; because all observation and experience, in *Maryland*, had demonstrated, that the reverse would be the result; that slaves, for the most part, were far better fed and clothed; more contented and happy; and in point of sobriety, virtue and moral character, far above the free coloured population of the State. But the design of these enactments was to gratify the masters of slaves, to enlarge their privileges, and to give them an authority to dispose of their slaves, in a way which otherwise they did not possess. If the policy of our legislature had been to foster emancipation, and to put an end, as far as practicable, to the continuance of slavery, by the encouragement of manumission, instead of restricting the means of accomplishing it, by rendering all deeds for that purpose void and inoperative, unless signed in the presence of two witnesses, acknowledged before a justice of the peace of the county, of his, (the master's,) residence, and recorded within six months thereafter, it would rather have adopted the policy of the law of *England* in regard to villeins, which makes any act of the Lord, that can be construed into an intention, to treat the villein as a freeman, as "an implied manumission." By the 23rd sec. of the act of 1715, ch. 44, it was enacted: "That all negroes, and other slaves, already imported, or hereafter to be imported, into this province, and all children now born, or hereafter to be born, of such negroes and slaves, shall be slaves during their natural lives." The 3rd sec. of the act of 1752, ch. 1, enacts: "That it shall not be lawful for any person or persons within this province, by any verbal order, or by his, her, or their last will and testament, or by any other instrument of writing, in his, her or their last illness, whereof he, she or they shall die, to give or grant freedom to any slave or slaves; and if any person or persons, after the time aforesaid, shall, by any verbal order, or by his, her or their last will and testament, or by any other writing or instrument, in his, her or their last sickness, whereof he, she or they shall die, give freedom to any slave or slaves, such order, will, or other instrument, shall be void and of no effect,

so far as relates to such freedom or manumission." These enactments show, too clearly to admit of any doubt, what were the general designs of the legislature in relation to slavery, at the time those acts of Assembly were passed. And, except as to the power of testamentary manumission, subsequent legislation has shewn no very material change in the views of the legislature upon the subject of slavery.

But what part of the court's decision is it, that, in the case of *The State vs. Dorsey, Exc'r of Worthington,* it is thought, is decisive of the question now before us? It is that which states, "that the manumission or bequest of freedom to a slave, by last will and testament, confers on such slave the identical rights, interests and benefits which would pass, if the testator had bequeathed the same slave to another person." The inference attempted to be drawn from this expression of the court, is manifestly not warranted by what the court have said, or designed to say. It was speaking in reference to the bequest in the will before it, and was, as its language imports, alluding only to a general bequest of freedom; not to a bequest qualified by conditions, either precedent or subsequent. To such a case it did not, and had no design to make the slightest allusion.

It is also said, that, as the court has declared, that "the manumission or bequest of freedom to a slave, by last will and testament, confers on such slave the identical rights, interests and benefits which would pass, if the testator had bequeathed the same slave to another person," the rights and benefits conferred on the slaves ever afterwards continue his separate property, and as much subject to taxation, or to any proceedings against the manumitted slave, as such slave would be liable to, had he been bequeathed to a new master. In such an argument, there is more of subtlety than of solidity; it pushes the *argumentum ad absurdum* quite beyond its legitimate limits. It might, almost with as much propriety, be insisted, that if the slave had been bequeathed to a new master and died, that such master should ever afterwards pay taxes in respect to such slave, because he was once the owner. All the rights of property and interest in the slave passed to the freeman, created by the be-

quest, and, by operation of law, were merged in him, and, as property, neither in fiction or fact, had afterwards any existence.

The conditions attached to the bequest of freedom in the will, under consideration, are manifestly conditions subsequent, and being subsequent, they are wholly unauthorised by the act of Assembly, and are therefore void. The power of testamentary manumission only exists in *Maryland*, in virtue of the 13th section of the act of 1796, ch. 67, and it can only be exercised in pursuance of the authority thereby given. A testator, under this enactment, is explicitly empowered to limit or prescribe the period at which manumission shall commence or take effect, but there his power ceases. Freedom having once commenced, the act of Assembly confers no power to the testator, and he possesses none without it, to put an end to a state of freedom, and restore the condition of slavery. "Once free and always free," is the maxim of *Maryland* law upon the subject. Freedom having once vested, by no compact between the master and liberated slave, nor by any condition subsequent, attached by the master to the gift of freedom, can a state of slavery be reproduced. Nothing short of legislative power, duly exercised, can produce such a result; can convert a freeman into a slave.

By terms the most unequivocal in the will before us, the petitioner was to "be free at the age of thirty-eight years." That such was the intention of the testator, is demonstrated by the conditions attached to the bequest, as the performance of the conditions could not be legitimately affected, but by the assumption of the previous freedom of the petitioner.

JUDGMENT AFFIRMED.